IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JOE LOUIS BYRD,

Petitioner,

vs.

STATE OF IOWA, and
JOHN FAYRAM, Warden,

Respondents.

No. C12-0099

REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................... 1

II.  PROCEDURAL HISTORY ........................................... 2

III. RELEVANT FACTS ................................................ 3

IV.  DISCUSSION ...................................................... 6
     A.   Applicable Law ............................................ 6
     B.   Byrd's Claims ............................................. 9
          1.   Due Process ......................................... 9
          2.   Sufficiency of the Evidence ........................ 12

V.   RECOMMENDATION .............................................. 16

## I. INTRODUCTION

This matter comes before the Court on the Amended and Substituted Petition (docket number 26) filed by Petitioner Joe Louis Byrd on December 10, 2013, and the Answer to Amended Petition (docket number 29) filed by Respondents State of Iowa and John Fayram on December 18, 2013. On April 8, 2014, Judge Edward J. McManus

referred the matter to me for a report and recommendation as to disposition, in accordance with 28 U.S.C. § 636(b)(1)(B). *See* Order (docket number 41).

## II. PROCEDURAL HISTORY

On October 4, 2012, Joe Louis Byrd filed a petition under 28 U.S.C. § 2254 for writ of *habeas corpus* by a person in state custody. Respondents filed an answer on January 14, 2013. The Court then established a briefing schedule.

On February 6, 2013, Judge McManus appointed attorney Philip B. Mears on Byrd's behalf. The briefing schedule was extended. On August 27, 2013, Byrd filed a motion for discovery.[1] On October 29, 2013, I denied Byrd's motion for discovery and extended the briefing schedule again. Byrd appealed to the district court my decision denying discovery.

On December 10, 2013, Byrd filed an amended petition. Three days later, on December 13, he filed a motion requesting an evidentiary hearing. Respondents filed an answer to the amended petition on December 18, and resisted Byrd's request for an evidentiary hearing.

On December 20, 2013, Judge McManus entered an Order denying Byrd's appeal from the ruling regarding discovery and "the related motion for an evidentiary hearing." On December 24, Byrd filed a "Motion for Clarification or for Reconsideration." Byrd asked that if the Court intended to resolve the motion for an evidentiary hearing in its earlier order, that it "amplify its order to set out the grounds for denying the Motion for a hearing." On February 5, 2014, Judge McManus entered an Order denying the motion to reconsider, but provided additional authority to support his conclusion "that an evidentiary hearing is not warranted." *See* Order (docket number 37) at 2.

---

[1] Byrd filed a similar motion on June 21, 2013, but it was denied without prejudice for failing to comply with Local Rule 7.*l*.

Accordingly, this case is submitted on the briefs filed by the parties. Byrd filed a Brief on the Merits (docket number 36) on December 31, 2013, Respondents filed a Brief on the Merits (docket number 38) on February 28, 2014, and Byrd filed a Reply Brief (docket number 39) on April 1, 2014.

## III. RELEVANT FACTS

In his amended petition, Byrd seeks relief from disciplinary action imposed while Byrd was an inmate with the Iowa Department of Corrections ("IDOC"). In September 2009, Byrd was an inmate serving a state sentence at the Newton Correctional Facility ("NCF"). During the week of September 14, 2009, an inmate with the initials "RS" was allegedly raped at NCF by "at least five other inmates." However, no information about this assault was presented to the staff for several months.

On January 5, 2010, for reasons apparently unrelated to the alleged sexual assault, Byrd was transferred to the Anamosa State Penitentiary ("ASP"). For approximately one week after he arrived at ASP, Byrd was placed in the general population. On January 12, 2010, Byrd was placed in administrative segregation. Byrd was subsequently questioned by an investigator from NCF.

On March 3, 2010, Byrd was given a disciplinary notice at ASP, charging him with a number of major rule violations relating to a group sexual assault on inmate RS at NCF during the week of September 14, 2009. The "narrative" portion of the notice described the violation as follows:

> An investigation was conducted by Investigative Captain Shane Franklin of the Newton Correctional Facility and Randy Hanssen of the Division of Investigative Services in regards to an alleged sexual assault that took place during the week of September 14, 2009. The following is a brief synopsis of the investigation. In the course of a sexual assault investigation conducted involving Offender [RS] #1108110 the following conclusions were made. That on or about the date of September 14th or 15, 2009, Offender [S] was forced into cell 8 of Living Unit D of the Newton Correctional Facility. This

cell was the living quarters of Offenders Joe Byrd #1003390 and Napoleon Evans #0805181. Once inside the cell, Offender [S] was physically and sexually assaulted by Offenders Roosevelt Matlock #0801210, Joe Byrd #1003390, Calvin Young #0083676, Napoleon Evans #0805181 and Henry Greer #0805685. This incident involved both forced sexual penetration and kidnapping, as Offender [S] was held against his will for a period of 1 1/2 to 3 hours and instructed not to talk about the incident. The result of the investigation into the allegation that Offenders Matlock, Byrd, Young, Evans and Greer raped Offender [RS] is SUBSTANTIATED. These acts and the kidnapping of Offender [S] are defined as serious and dangerous violence in the disciplinary policy. This report is based, in part, on confidential information. This information will remain confidential to protect the individuals involved.

Disciplinary Notice dated 03/03/2010 (docket number 7 at 26).

On March 6, 2010, as provided in IDOC policy, Byrd saw an investigator at ASP assigned to discipline. Byrd provided the investigator with the names of a number of witnesses, including the alleged victim. Byrd told the investigator that he had never even spoken to some of the inmates identified in the disciplinary notice. Byrd denied committing the offense.

On March 12, 2010, Byrd appeared before William Soupene, "the long-time ALJ at ASP." Soupene met with Byrd for a few minutes, and then continued the hearing for further investigation. On March 17, Byrd had a hearing on this same issue before a different administrative law judge, Kristian Anderson, the administrative law judge at NCF. The hearing was held over the Iowa Communications Network. Later that day, Anderson found Byrd guilty of assault and kidnaping, both "Class A" violations. Anderson sentenced Byrd to 365 days of disciplinary detention, and took away 365 days of earned time. Taking away the earned time had the effect of lengthening Byrd's prison sentence.

On March 17, 2010, Byrd took an administrative appeal. The appeal was denied by Terry Mapes, the warden at NCF, on March 25, 2010.

Byrd then sought relief in the Iowa District Court. On June 15, 2010, Byrd filed an application for post-conviction relief in the Iowa District Court for Jones County. Byrd's request for court-appointed counsel was denied, because Iowa law does not allow appointed counsel in a post-conviction relief action involving the loss of time in a prison discipline case. Byrd tried to obtain discovery in the post-conviction proceeding, but "was repeatedly told by several different judges that discovery was not permitted." Based on pretrial rulings made by state district judges, the only issue presented at trial was the "sufficiency of the evidence." Byrd tried to subpoena ALJ William Soupene to appear at the hearing, but the motion was denied due to "the limited nature of the post conviction hearing."

On July 26, 2011, a hearing was held before Iowa District Judge Marsha Beckelman on Byrd's application for post-conviction relief. At the beginning of the proceeding, Judge Beckelman told Byrd that he could not present any evidence at the proceeding, and was limited to argument. On January 13, 2012, Judge Beckelman filed her ruling, denying the application for post-conviction relief. Judge Beckelman found there was sufficient evidence to sustain the disciplinary decision, and she rejected, without discussion, Byrd's other claims, including his claim that the ALJ was biased.

Byrd appealed the trial court's decision to the Iowa Supreme Court. Among other things, Byrd complained that he had not been able to call ALJ William Soupene to testify at the post-conviction hearing. Byrd also argued that the evidence presented at the hearing was not sufficient to find him guilty. The notice of appeal was treated as a petition for writ of *certiorari*, and on August 23, 2012, a single judge of the Iowa Supreme Court denied Byrd's petition. Byrd filed an application for reconsideration. On February 11, 2013, a three-judge panel of the Iowa Supreme Court confirmed the order denying *certiorari*.

Meanwhile, on October 4, 2012, Byrd brought the instant action in this Court.

## IV. DISCUSSION

In support of his petition for *habeas corpus* relief, Byrd raises two arguments: First, Byrd claims that his due process rights were violated when IDOC administrators reassigned the case from ALJ William Soupene to ALJ Kristian Anderson. Second, Byrd claims that there was not sufficient evidence to sustain a finding that Byrd had sexually assaulted another inmate. I will begin the discussion by reviewing a prisoner's right to *habeas corpus* relief generally.

### A. Applicable Law

After exhausting his state court remedies, a state prisoner may bring an action in federal court pursuant to 28 U.S.C. § 2254 to challenge the result of a disciplinary proceeding. *Preiser v. Rodriguez*, 411 U.S. 475, 485-87 (1973); *Portley-el v. Brill*, 288 F.3d 1063, 1066 (8th Cir. 2002). In 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended the federal *habeas corpus* statute, 28 U.S.C. § 2254, and "placed a new restriction on the power of federal courts to grant writs of *habeas corpus* to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399 (2000). In determining whether a petitioner is entitled to relief, the Court exercises "only limited and deferential review" of the underlying state court decision. *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004). AEDPA modified the federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials'" and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 603 (2002).

Regarding the merits of a claim, "federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, _____ U.S. _____,

131 S. Ct. 770, 785 (2011) (citation omitted). In its recent *Harrington* opinion, the Court emphasized the limited authority which the federal court may exercise in a *habeas* proceeding brought by a state court prisoner.

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington*, 131 S. Ct. at 786-87.

Obtaining relief pursuant to section 2254 is doubly difficult in the context of a prison disciplinary proceeding due to the limited procedural requirements and low standard of proof imposed by the Court. In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court held that when a prisoner is facing the loss of "good time" in a prison disciplinary proceeding, he is entitled to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557. The Court noted, however, that the deprivation of good time "is qualitatively and quantitatively different from the revocation of parole or probation," and the procedural rules "designed for free citizens in an open society, or for parolees or probationers under only limited restraints" do not apply. *Id.* at 560-61. The Court discusses at some length the difficulties associated with prison disciplinary proceedings and notes that "[r]etaliation is much more than a theoretical possibility." *Id.*

at 561-63. *Wolff* held that the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. *Id.* at 563-67. *See also Backstrom v. Iowa Dist. Ct.*, 508 N.W.2d 705, 707-08 (Iowa 1993).

In *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445 (1985), the Court established the standard of proof required to satisfy a prison disciplinary decision. The Court held that "revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by *some evidence* in the record." *Id.* at 454 (quoting *Wolff*) (emphasis added). The Court explained the reasons for its holding:

> We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced." Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, and neither the amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence applies in this context.

8

*Superintendent*, 472 U.S. at 455-56 (all citations omitted).

### B. Byrd's Claims

#### 1. Due Process

I now turn to Byrd's argument that his due process rights were violated when the case was reassigned to another ALJ. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." While a prisoner's rights "may be diminished by the needs and exigencies of the institutional environment," he is nonetheless entitled to claim the protections of the Due Process Clause. *Wolff*, 418 U.S. at 555-56. In *Wolff*, the Court held that where a state has created a prisoner's right to "good time" and has recognized that its deprivation is a sanction authorized for major misconduct, then "the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557. *See also Sanford v. Manternach*, 601 N.W.2d 360, 366 (Iowa 1999) (recognizing that a prisoner has an interest of "real substance" in the reduction of his sentence for good-conduct time and, therefore, is entitled to the protection of the Due Process Clause).

Here, Byrd argues that his due process rights were violated "when IDOC administrators: (1) took the case away from the ALJ at ASP, who, they knew, had expressed doubts about the evidence against Mr. Byrd, and (2) gave the case to the ALJ at NFC who already had found the co-defendants guilty based on the same evidence."[2] It is undisputed that the disciplinary action against Byrd was initially assigned to the ALJ at ASP (where Byrd was then incarcerated) and then reassigned to the ALJ at NCF (where

---

[2] Byrd's Brief on the Merits (docket number 36) at 22.

the assault allegedly occurred).    In their answer to Byrd's amended and substituted petition, Respondents admit the following allegations:

> 44.    On March 12, 2010, Mr. Byrd appeared before William Soupene, the long-time ALJ at ASP. The ALJ met with Mr. Byrd for a few minutes, and then continued the hearing for further investigation.
>
> . . .
>
> 59.    Mr. Soupene also called the administrator at the DOC Central office, who was in charge of implementing the federal Prison Rape Elimination Act in Iowa. . . .
>
> 60.    That administrator became upset with Mr. Soupene, stating that the investigation had gone on for a long time and she believed there was enough information to allow for a decision.
>
> 61.    Almost immediately, an administrator from the IDOC Central office contacted the Warden's Office at ASP. That person told the Warden's office said [sic] that Mr. Soupene was not under any circumstances to proceed with Mr. Byrd's case. The Deputy Warden at ASP gave this directive to Mr. Soupene.
>
> 62.    It was then arranged that the hearing would be held over the ICN (Iowa Communications Network) with the ALJ at Newton.    These events transpired after Mr. Soupene's meeting with Mr. Byrd on March 12, 2010 and before the hearing before the Newton ALJ on March 17, 2010.
>
> 63.    The Newton ALJ, Kristian Anderson, had, on March 11, 2010, already found the four other inmates, Roosevelt Matlock, Henry Grier, Napoleon Evans, and Calvin Young, guilty, as charged.

Answer to Amended Petition (docket number 29) at 3-5.

In his initial brief on the merits, Byrd describes the "legal basis" of this claim as the right of an inmate in a prison disciplinary case "to have a neutral fact-finder."[3] The Eighth Circuit Court of Appeals has recognized that "'an impartial decision-maker is a fundamental requirement of due process . . . fully applicable' in the prison context." *Malek v. Camp*, 822 F.2d 812, 816 (8th Cir. 1987) (quoting *Wolff*, 418 U.S. at 592 (Marshall, J., concurring)). According to his brief, "Mr. Byrd alleges, in his amended pleading, that he didn't have a neutral fact-finder in this case."[4] However, Byrd fails to cite any evidence that ALJ Anderson was biased in this case, other than the fact that he had found the evidence sufficient to conclude that the other four persons named in the investigation had sexually assaulted the victim inmate. Byrd fails to cite a single case for the proposition that a judicial officer is disqualified from hearing a case against a defendant when he or she has previously heard and decided a case against a co-defendant on the same facts.

In her ruling on Byrd's application for post-conviction relief, Judge Beckelman found that "there is no indication in the record that the ALJ was biased against the Applicant."[5] "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006). I agree with Judge Beckelman, that Byrd offers no evidence that ALJ Anderson was biased against Byrd.

Indeed, in his reply brief Byrd largely abandons his argument that he did not have a "neutral fact-finder." Instead, Byrd asserts the "real issue" is the decision to reassign the case from ALJ Soupene to ALJ Anderson.

---

[3] *Id.* at 29.

[4] *Id.* at 30.

[5] Judge Beckelman's Ruling at 6 (docket number 7 at 23).

> While some of Mr. Byrd's complaint is framed that ALJ
> Anderson was "biased", his major focus is on the ultimate
> corruption of the Department of Corrections in taking the case
> away from ALJ Soupene. If a Department of Corrections
> Central Office employee bribed the first ALJ to drop a case,
> the fact that they found an upstanding second ALJ doesn't save
> the case from constitutional challenge.

Byrd's Reply Brief (docket number 39) at 4-5. However, Byrd again fails to cite any authority in support of his argument.

Here, the sexual assault allegedly occurred at NCF. ALJ Anderson had already held a hearing for the four inmates who remained at NCF. Because Byrd had previously been transferred to ASP, however, ALJ Soupene was assigned to hear the allegations against Byrd. Apparently, after speaking with Byrd for "a few minutes," Judge Soupene believed that additional investigation was required. Clearly, Byrd would have preferred his case to be heard by ALJ Soupene. Byrd provides no authority, however, to support his contention that the Due Process Clause of the Constitution prevents a case from being reassigned to another judicial officer. That is, while Byrd has a constitutional right to an impartial decision-maker, he is not entitled to a judge of his own choosing. Because there are no facts which would support a finding that Judge Anderson was biased in this case, Byrd's due process claim must fail.[6]

### 2. Sufficiency of the Evidence

Next, Byrd asserts that the evidence presented at the hearing was not sufficient to support a finding that he had sexually assaulted another inmate. "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record." *Superintendent*, 472 U.S. at 454. On January 13, 2012, State District Judge

---

[6] In his Brief on the Merits, Byrd concedes that his first claim "doesn't seem [to] have a significant evidentiary basis at this point." Byrd's Brief on the Merits (docket number 36) at 7.

Marsha M. Beckelman filed her Ruling, denying Byrd's application for post-conviction relief. In her conclusions of law, Judge Beckelman identified the "some evidence" standard to be applied when reviewing a prison disciplinary decision.

> "When a court reviews a prison disciplinary decision, due process requires the court to affirm the disciplinary committee's action as long as 'some evidence' supports the committee's decision." Backstrom v. Iowa Dist. Court for Jones County, 508 N.W.2d 705, 710 (Iowa 1993). "In Wilson [v. Farrier, 372 N.W.2d 499, 501 (Iowa 1985)], we explained the justification for this rule:
>
> [T]he role of the district court is not to afford a de novo review of the disciplinary board's factual findings. The district court should simply determine whether the decision was supported by *some* facts. The sole and only issue of constitutional substance is whether there exists any evidence at all, that is, whether there is any basis in fact to support the action taken by the prison officials. Otherwise the federal court would assume the task of retrying all prison disciplinary disputes.
>
> Id. (citing Wilson, 372 N.W.2d at 502). "In addition, as the U.S. Supreme Court noted in [Superintendent v. Hill, 472 U.S. 445, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)], '[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances.'" Id. (citing Hill, 472 U.S. at 456, 105 S. Ct. at 2774, 86 L. Ed. 2d at 365). "Thus, the justification of the 'some evidence' rule rests on the need to balance the prisoners' due process interests against the government's interest in 'assuring the safety of inmates and prisoners [and] avoiding burdensome administrative requirements that might be susceptible to manipulation.'" Id. (citing Hill, 472 U.S. at 454-55, 105 S. Ct. at 2773, 86 L. Ed. 2d at 364).

Judge Beckelman's Ruling at 5 (docket number 7 at 22).

After identifying the violations being charged, Judge Beckelman then concluded the state had met its burden of proof.

> There certainly is "some evidence" to support the disciplinary decision against the Applicant, regardless of whether there is any videotape recording of the events that led to the disciplinary action against the Applicant. The evidence is found in the form of the confidential records of the investigation of the events leading to the disciplinary action, the witness statements submitted for the ALJ's consideration, as well as the Applicant's own testimony regarding the events that took place and the credibility the ALJ gave to this testimony. Under the Penitentiary's policies, this could be found, at the least, as supporting a finding that the Applicant committed the violations alleged to have taken place. Thus, the Applicant's arguments that there was an inadequate statement of evidence relied upon or reasons for decision; that there was an improper use of "confidential information;" and that videotapes should have been reviewed all fail. The Court also finds that the Applicant received proper and timely notice of the violations. There is sufficient evidence in the record and a sufficient description of the events leading to the disciplinary action for the Applicant to have been made aware of the allegations against him. Further, the Applicant had sufficient time to prepare for the disciplinary hearing, particularly since the original hearing date was continued. Finally, there is no indication in the record that the ALI was biased against the Applicant.

*Id.* at 6 (docket number 7 at 23).

The administrative record available to Judge Beckelman exceeded 750 pages.[7] Included in the record were witness statements, recordings of interviews, and transcripts

---

[7] The record was filed under seal as docket number 9. In a memorandum to the file, Judge Anderson concluded that "[g]iven the nature of the violations found and the sanctions, as well as the documented gang memberships of the inmates found to have perpetrated the sexual assault, I believe that release of any of the information could subject the individuals giving the information to potential danger."

of interviews. ALJ Kristian Anderson, completed a "confidential information summary," specifically finding that the victim inmate was credible. However, Judge Anderson concluded that statements about the length of the assault were not credible. In her ruling on Byrd's application for post-conviction relief, Judge Beckelman concluded that "[t]here certainly is 'some evidence' to support the disciplinary decision against the Applicant."

It doesn't matter what a federal judge reviewing the case in a *habeas* proceeding would have done in the first instance if he or she had heard the evidence rather the ALJ, or even what the federal judge would have done if he or she had heard the application for post-conviction relief. Instead, the issue is whether a federal judge can conclude that Judge Beckelman's finding that the ALJ's decision was supported by "some evidence" was unreasonable. *Rousan*, 436 F.3d at 956 ("[I]t is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable."); *Morales v. Ault*, 476 F.3d 545, 549 (8th Cir. 2007) (it is not enough that a federal habeas court conclude in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly; rather, that application must also be unreasonable). I cannot make that finding. In fact, I agree with Judge Beckelman's conclusion that there is some evidence to support the ALJ's decision.

A finding that a state court decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" — as required by 28 U.S.C. § 2254(d)(2) — "is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, _____ U.S. _____, 131 S. Ct. 1388, 1398 (2011) (internal citations omitted). Because Judge Beckelman did not unreasonably conclude that there was "some evidence" to support the ALJ's finding that Byrd sexually assaulted the victim inmate, there was no due process violation. Byrd is not entitled to *habeas* relief on this ground.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Amended and Substituted Petition (docket number 26) filed by Joe Louis Byrd be **DISMISSED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this ___30th___ day of July, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA